## ATLANTIC INSURANCE CO. *v.* GOODALL *& a.*

A policy provided that the insurance should be void if there should be any other insurance on the property, without the consent of the directors indorsed on the policy. At the time of the application the property was insured in another office, by a policy with a similar provision, and it was understood that the old policy should continue until the new one was obtained, and that it should be then surrendered. The new policy took effect January 22, 1849, and upon its receipt the old policy was surrendered, to take effect at the same hour, but was not discharged in the office till February 1. In an action for assessments on the new premium note, it was *held*, that this policy was not wholly *void* for want of an indorsement, but was capable of confirmation by the company, and that a letter of the Secretary, declaring the policy good after he was informed of all the facts, and a subsequent claim and acceptance of an assessment, were each a waiver of the exception, and a confirmation of the policy.

It was also *held*, that the surrender of a policy, to take effect at a fixed date, discharged all claim of the insured from that date, without regard to the time it is discharged by the company.

The policy once attached is a valid consideration for the premium note, which remains in force, notwithstanding the release or discharge of the policy, till the discharge is communicated to the office, and the assessments and dues are paid.

Though a policy is, by its terms, to take effect at a certain time, yet it may be shown that, from want of delivery, failure to comply with some condition precedent, or other cause, it did not take effect till a subsequent time.

ASSUMPSIT upon a premium note for $436.50, dated January 22, 1849, (See the form, 8 Foster 182.) It appeared an assessment was made on this note, January 29, 1849, which was paid by the defendant on the 15th of August, 1849. Another assessment was made January 28, 1850, for the recovery of which the action is brought.

The defendant contended that the note was without consideration, because the policy was void from the first, for the reason that, at the time it should have taken effect, the property was covered by an insurance in the N. H. Mutual Fire-Insurance Company, without the assent of the directors indorsed on the policy, according to the plaintiffs' charter. The 16th section of the charter of each of these insurance companies was made part of their policies by reference, and was as follows: " If insurance on any house, building, or other property, shall be and subsist in said company, or in any other company, or from or by any other person, at the same time, the insurance made in this company shall be deemed and become void, unless such double insurance subsist with the consent of the directors, signified by indorsement on the back of the policy, signed by the president and secretary."

On the part of the plaintiffs it was contended that the policy had been ratified and confirmed by the company, and the policy and note were binding on the parties.

A witness testified that in the winter of 1849, one Gale called on the defendant, and recommended him to have his buildings insured in the plaintiffs' company. The defendant spoke of his having insurance in the New-Hampshire Mutual Fire-Insurance Company, and said he did not wish to change his insurance, unless it could be so done as to leave no interval between the insurances, and Gale said he would fix it all right; that Goodall might retain his policy in the New-Hampshire company until the new one was obtained, and then surrender it, and that he (Gale) would see to it, and make it all right in the Atlantic company. Soon after, the policy issued by the plaintiffs was received by the defendant, and he then surrendered his policy to the New-Hamp-

shire company, to be cancelled. · It appeared that the defendant enclosed his policy in a letter, addressed to the directors of the New-Hampshire company, saying, " I surrender the policy, and wish it cancelled from this date, January 22, 1849, at noon." The letter and policy were received at the New-Hampshire office February 1, 1849, and the policy cancelled on that day, being considered and treated by them as subsisting till then.

March 5, 1849, Mr. Goodall wrote to the plaintiffs' secretary, suggesting a doubt if his policy was valid under the 16th section of the charter, and requesting an indorsement of consent to the continuance of the policy in the New-Hampshire office. The secretary replied by letter of March 7, that if he had surrendered his policy in the New-Hampshire company, he might rest assured his policy was good, and no indorsement was necessary.

August 1, 1849, Mr. Goodall wrote for an explanation in regard to the assessment of January 29, 1849, and repeated his request for an indorsement. The plaintiffs' treasurer replied, giving the information asked, and stating that the secretary thought an indorsement unnecessary.

May 15, 1850, the plaintiffs' secretary, in reply to a letter of Mr. Goodall, wrote to him explaining why an indorsement was unnecessary ; and there was some subsequent correspondence between the parties, in which the defendant insisted the policy was void for want of an indorsement, and the insurance company insisted that the policy was valid without an indorsement.

The court being of the opinion that the note declared on was void for want of consideration, directed a verdict for the defendant, subject to the opinion of the Supreme Court.

*Willis,* for the plaintiffs, relied on the case of *Atlantic Mutual Fire-Insurance Company* v. *Goodall,* 9 Foster 182.

*S. H. Goodall,* for the defendant.
The facts in this case differ from those in 9 Foster. The court there assume that the plaintiffs' policy was not to take effect until the surrender of the policy in the New-Hampshire company.

The case shows an assessment January 29, 1849, on the defendant's note, as a subsisting note, which was paid : That the agreement with Gale was, that the defendant *might* retain his policy in the New-Hampshire company *until* the new one was received, and *then* surrender it, and Gale " would fix it all right; " and the policy in the New-Hampshire company was not discharged till February 1.

The construction of the court in 9 Foster allows parol evidence to contradict the written contract. The policy, which is a merging of the verbal agreement, provides that the plaintiffs insure the defendant from January 22, 1849, to January 22, 1852. By the construction of the court, the insurance did not commence till February 1, 1849.

In that case the defendant does not get his two years' insurance. Gale was to fix it right, so that he should be insured the two full years. This agreement, upon the construction in 9 Foster, was not performed, and the defendant had a right to avoid the policy.

The assessment and payment shows that both parties understood the policy was in force from its date.

Goodall's letter of March 5, 1849, shows that he understood his policy was to take effect from its date, and that both policies were to subsist together for a short time, and that Gale was to fix it, so that it might be done safely. The plaintiffs' letters of May 15 and August 7 show the same understanding.

Neither of the parties claimed such an agreement as the court made for them.

The company were governed in their assessment by the date of the note, and not by any agreement outside the papers.

The case, then, finds that there were two policies subsisting at the same time; that here was a case of double insurance for nine days, and the policy was void. *Clark* v. *New-England Fire-Insurance Company,* 6 Cush. 34; *Atlantic Mutual Fire-Insurance Company* v. *Goodall,* 9 Foster 182.

BELL, J. A material question presented by this case is,

whether, by virtue of the 16th section of the plaintiff's charter, their policy becomes absolutely void in case another insurance shall exist on the property without their consent, or whether it is merely voidable, and capable of being affirmed, or again made valid by the subsequent acts of the company or its agents.

This section is part of the policy, and by its terms it declares the policy shall become *void*, &c. If this section is to be so construed as to render the policy *void absolutely*, in case of double insurance — *void in the strictest sense* — a mere nullity, then, leaving out of consideration for the present the effect of the agreement with Gale, and the effect of the surrender, to which we shall hereafter advert, the plaintiffs' policy never took effect; the note on which the action is founded was without consideration. There being, at the time the policy should have taken effect, a subsisting insurance in the New-Hampshire company, it became at once inoperative and void.

In such a case, and upon that construction of the 16th section, it seems to us clear that the original insurance must always defeat the operation of that which is subsequent, where the same provision is found in both charters, and its own validity must always remain unaffected by such second and abortive policy. And this was the view of the court in *Jackson* v. *Mass. M. F. I. Co.*, 23 Pick. 433, and in *Barrett* v. *Union M. F. I. Co.*, 7 Cush. 179, where numerous authorities are cited in support of the same rule.

On their face these authorities all go to sustain the position that the second policy in the case before us is *void*. But the term *void* is equivocal. It may import *absolutely null*, or merely voidable, and it is often used where the contract to which it applies has a capacity to be affirmed, and thus rendered effectual from the first, the affirmance operating as a waiver of the right to avoid. *State* v. *Richmond*, 6 Foster 237, and authorities; *Smith* v. *Saxton*, 6 Pick. 437.

It is, therefore, always to be considered in what sense the word *void* is used, not only in the case of contracts and statutes, but in the opinions of courts; and this is to be determined by

the connection and circumstances in which the term is used. If, in the decision of a cause, the nature of the case necessarily or naturally raised the question, whether a contract, for example, was absolutely null, or merely voidable ; whether it was valid until it was avoided, or was invalid until it was affirmed; we may naturally understand the word *void* unqualified in its most stringent sense ; but if no question was raised in the case as to the degree of invalidity, we may construe the word in any of its recognized and legitimate senses ; and it is not, of course, to be taken as importing absolute and incurable invalidity.

We have therefore turned our attention to the several cases to which we have been referred, as establishing the proposition that a policy, under the circumstances of the case before us, is void, to see if there was any thing in those cases which would justify the opinion that the term *void* was used in those cases in the sense of absolutely null, to all purposes whatever, rather than in its more ordinary sense of invalid and defective, at the choice of the party supposed to be bound ; but still capable of being confirmed, if he chooses to waive the objection.

In *Jackson* v. *Mass. M. F. I. Co.*, 23 Pick. 418, which is by much the strongest case, the terms of the rule are somewhat different from those in the present case. " It shall, *ipso facto*, annul the policy," though it is not necessary to rely on that circumstance. The language of the learned judge, *Dewey*, is, " by the condition of that policy, that insurance was wholly void and inoperative, and, being so, cannot be set up by the defendants as evidence of the plaintiffs' having procured a second insurance. An insurance that shall operate to avoid the policy of the defendants, must be a valid and legal policy, and effectual and binding upon the assurers." The case presented no facts upon which any question could arise as to the nature or degree of the defect. It was enough that it was not *valid* and *binding* upon the assurers. It may, therefore, be reasonably assumed that the question of its absolute and incurable invalidity was not before the court. It might have been otherwise if that case, like the present, had

raised the question of a subsequent ratification by the company, either by an express written consent to the continuance of the older policy, or by other acts equivalent.

In the policy there in question, there arose a point in relation to another clause of the policy, which provided that "when any mansion house, &c., shall be alienated by sale or otherwise, the policy shall thereupon be *ipso facto void*, but the grantee or alienee, having the policy assigned to him, &c., may have his policy renewed," &c. ; which seems to show that the policy was not to be void in the strictest sense, but to have a capacity of renewal ; but the decision did not turn on that point.

No question as to the nature of the invalidity of a policy in the case of another insurance existing without consent, arose in the cases of *Liscom* v. *Boston M. F. I. Co.*, 9 Met. 205 ; *Holmes* v. *Charlestown M. F. I. Co.*, 10 Met. 211 ; *Barrett* v. *Union M. F. I. Co.*, 7 Cush. 179 ; *Roberts* v. *Chenango F. I. Co.*, 2 Denio 75 ; *Carpenter* v. *Prov. M. I. Co.*, 16 Pet. 495 ; *S. C.*, 1 Story 57 ; *Denison* v. *Thomastown M. I. Co.*, 2 App. 125 ; *Meriam* v. *Middlesex Ins. Co.*, 21 Pick. 162 ; *Wilson* v. *Herkimer I. Co.*, 2 Seld. 59 ; *Macomber* v. *Middlesex M. F. I. Co.*, 8 Cush. 133 ; *Marshall* v. *Columbian I. Co.*, 7 Foster 165. In none of these cases is it held that the policy is void to that degree that it is not only invalid and inoperative, but wholly incapable of being made valid and effectual by any waiver of the objection or ratification.

If the word *void* is understood in the sense of invalid, or not binding, the contract might be capable of ratification or confirmation by subsequent acts of the company, either directly affirming it or waiving their objections to it.

We have found no direct decision establishing the capacity of a void policy to be made effectual by acts constituting a waiver. In *Neeley* v. *Onondaga Co. Ins. Co.*, 7 Hill. 50, it was contended that a policy, avoided by an alienation, was made binding by an assessment to pay a subsequent loss, but the point was not decided. But in many cases we find it assumed, or incidentally admitted, as in *Goodall* v. *N. E. F. Ins. Co.*, 5 Foster 169 ; *Leathers* v. *Farmers' M. F. I. Co.*, 4 Foster 261 ; *Raumage* v.

*Ins. Co.*, 1 Greenl. 110; *Potter* v. *Ontario & L. M. I. Co.*, 5 Hill. 147, and in the case of *Allen* v. *Vermont M. F. I. Co.*, 12 Vt. 366; where it was held that the receipt of an assessment will not make the policy binding, where a material fact is omitted in the application, unless the company or its agents were aware of the omission; thus implying, as the judge at *nisi prius* charged, that if they were aware of the omission at the time of the assessment, they were bound. The true construction of the charter, then, we think, is not to render the policy incurably void, but voidable, and capable of confirmation by acts indicating a waiver of the objection.

Upon this construction it is made clear by the case, that the agent of the company was fully aware of the prior insurance, and of the wish of the insurer not to surrender the old policy until the property was covered by the new; and proposed the arrangement adopted to effect that object, and the company were chargeable with his knowledge, and Mr. Goodall, on the 5th of March, after the date of the policy, wrote to the secretary, stating the facts to him, and suggesting an apprehension of some difficulty on that account, and two days after the secretary wrote to him, saying, " if you have surrendered your policies [in the New-Hampshire company,] you may rest assured that your policies are good as they are, and no indorsement is necessary;" and it was after this, in August, that the company demanded of the defendant the assessment voted January 29, 1849, two days before the New-Hampshire company's policy was cancelled by them, the defendant paid it, and the company accepted it.

By the secretary's letter, and the acceptance of the assessment, if the policy was only voidable for want of the indorsement, and the company had power to waive the exception, it was most effectually done, and the company would not have been allowed afterwards to take the exception.

We arrive at the same result, that the policy was valid and in no way affected by the policy which had previously existed in another way.

It is assumed by the plaintiff that the note and policy were dependent on each other, and that the policy remained in force

as long as the note was not discharged ; but such is not our view of the case. The note was in force until all the assessments for losses incurred during the continuance of the policy are paid, and it is regularly discharged, and the note is not liable to be discharged until the policy is regularly discharged on the records of the company. It remains, subject to assessments, till the discharge of the policy, or till such notice to the officers of the company of a surrender, assignment of the property, or other cause of discharge, as would make it their duty to discharge it. In the language of *Beardsley*, J., in *Neeley* v. *Onondaga Ins. Co.*, before cited : "Although the plaintiff's policy became void by the alienation of the property, it does not follow that his deposit note was also void. On the contrary, until he surrendered his policy and paid his proportion of all losses which accrued prior to such surrender, the deposit note remained obligatory upon him."

In companies of this kind the assured holds one part of the entire contract, and the assurer the other, and each may discharge his part of it at his pleasure. If the assured sells the property, the policy ceases to operate at once ; so it would be if he should execute a formal release of the policy ; and we think it clear, that where the assured surrenders his policy, to take effect at a certain hour, at which his new policy takes effect, for the very purpose of preventing a breach of the condition of the latter, his surrender operates as a release and discharge of the liability of the assured to him from that hour, without any act or assent of the company. He has exonerated them from their contract, and would be estopped to set up his policy against them, or to claim any thing of them in case of loss. Still, his note may remain valid, and subject to assessments for losses till notice of the surrender is received at the office.

A policy of insurance does not ordinarily take effect till it is delivered to the insured, though in terms it may commence at a previous date ; and where a previous policy was discharged by the assured upon receipt of a new one, it would neither be consistent with a reasonable construction of the contract, nor with the usages of business, to take note of the few minutes, or few

hours even, which might be reasonably required for the making of the surrender.

Upon this view there never did exist any double insurance, the old policy being discharged soon after the receipt of the new.

This defence fails also on the ground taken by the court in *Goodall* v. *Atlantic Mutual Fire-Insurance Company*, 8 Foster 197, that " it was understood by both parties, that upon the receipt of the present policy, the policy in the New-Hampshire Mutual was to be surrendered, and the defendant carried that agreement into effect, and therefore no question arises under the 16th section of the charter. Neither party ever contemplated a double insurance. The plaintiffs did not, for they so stated explicitly. The defendant did not, and he was satisfied with the matter as it was, until his attention was called to the 16th section, and then he feared that that section was so imperative in its terms as to control the agreement made between himself and the agent. If an action had been brought against the company to recover for a loss happening after the defendant received the policy, it is very clear that upon this evidence they could not have set up the defence of a double insurance. It is the ordinary case of an instrument complete in its form, but by the agreement of the parties not to take effect till a certain event. The parties do not differ in their understanding of the agreement." They differ as to its legal effect only.

Though no parol evidence can be received to add to, vary, explain, or control the terms of a written agreement, and consequently the verbal discussions of the parties previous to the execution of the contract, and all negotiations upon the subject, are inadmissible to change the construction of the writing, or to prove the existence of any contract or agreement inconsistent with its terms, yet this rule is not to be so extended as to exclude evidence of what was then done and said, as circumstances to be weighed in giving a construction to the writing, if that is in doubt, nor to exclude evidence of any collateral agreement made at the time, which is consistent with the writing; particularly where the writing is an instrument not purporting to con-

tain the whole of a special contract, as in the case of a promissory note, or deed of land, or receipt for money, which may be and often are accompanied by special agreements as to other matters not written, nor to exclude evidence of agreements relative to the delivery or disposition of written contracts. "There is no doubt," say the court, in the case last cited, " that a policy of insurance may be made out, complete in all its forms, and upon its face taking effect from the date therein mentioned, but with an understanding that it should not become operative and binding upon either party until the happening of some certain event. For instance, a policy might be executed in proper form, and delivered to the insured, together with the form of a note to be executed by him and a surety. If, however, it should be proved that the policy was delivered with the agreement that it should not take effect until the execution and delivery of the note, the company would not be liable if a loss should happen before that time. If we reverse the position of the parties, and suppose a case where a note is made out and delivered to the company, with the agreement that the maker should not be holden until the policy should be delivered to him, he would not be liable for assessments upon the note until he should receive the policy." The last is the mode in which the business of insurance is almost wholly done by agents at a distance from the principal office.

The cases of notes delivered as an escrow, or for some special purpose, fully sustain this decision. *Jeffries* v. *Austin*, 1 Stra. 674 ; *Vallett* v. *Parker*, 6 Wend. 620 ; *Woodhull* v. *Holmes*, 10 Johns. 231 ; Ross's Leading Cases, Bills and Notes, 105 ; *Wienhalt* v. *Spilter*, 3 Camp. 376 ; Chitt. Bills 76 ; *Buss* v. *Culver*, 1 Hill 589.

Upon these views the court are of opinion that the plaintiffs were entitled to recover, and the verdict should therefore be set aside, and

*A new trial granted.*